UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LOUIS DIXON and FELICIA M. DIXON, *individually and on behalf of* ENN, JDN, and LNJ, *minors*,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF HEALTH & HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 17-11841<br>Honorable Laurie J. Michelson<br>Magistrate Judge Mona K. Majzoub |

**ORDER GRANTING PLAINTIFFS' REQUEST TO PROCEED WITHOUT PREPAYMENT OF FILING FEE, SCREENING COMPLAINT PURSUANT TO 28 U.S.C. § 1915(e)(2)(B), AND DIRECTING PLAINTIFFS TO PROVIDE THE COURT WITH NAMES AND SERVICE ADDRESSES**

In November 2016, ENN was hospitalized because she ingested peroxide. Two psychiatrists believed that ENN required inpatient care, but ENN's parents, Louis Dixon and Felicia Dixon ("the Dixons") disagreed. Michigan's Children's Protective Services became involved, and in December 2016, a probate-court ordered that ENN remain in the hospital. The Dixons have filed this lawsuit in their personal capacity, and on behalf of their three minor children, including ENN. The Dixons assert a plethora of claims against a plethora of defendants. They also ask the Court to allow them to proceed without prepaying the filing fee and to order the U.S. Marshal to serve the defendants. (R. 2, 3.) The Court GRANTS that request. But, because it does so, it will screen the Dixon's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B). For the reasons that follow, the Court will DISMISS most of the Dixon's claims, but will direct the Dixons to provide names and service addresses of certain defendants so that the U.S. Marshals can serve the remainder of the complaint.

## I.

According to the Plaintiffs' complaint, in November 2016, ENN was taken to the emergency room at the Detroit Medical Center because she had ingested peroxide. (R. 1, PID 19.) ENN was transferred to the pediatric psychiatric ward at the DMC Children's Hospital of Michigan. (*Id.*) There, two psychiatrists thought that ENN needed inpatient care. (*See* R. 1, PID 19–20.) But the Dixons wanted ENN to have outpatient care. (R 1, PID 20.) DMC staff then allegedly threatened to call Michigan Department of Health and Human Services Children's Protective Services (CPS). (*Id.*) According to the Dixons: "We advised them at that time to call CPS because we need to take E.N.N. to seek help because we felt as though they would be dirty to us because of our representation as a Black Family." (R. 1, PID 20–21.)

At some point, perhaps two days after ENN had arrived at DMC, two Detroit police officers, Tillary and Jane Doe, arrived at the hospital. The Dixons allege: "Tillary continued to go on about . . . [whether] the[re] [is] a relative to take these children because she was overzealous about them going to foster care without cause. Officer Jane Doe was openly judgmental toward [us] by stating the following: 'Something is going on in that house and I am going to find out what is going on when CPS arrive[s].'" (R. 1, PID 22.) The Dixons say, "that both of these officer were homosexual and obviously bias against their heterosexuality as a Black Family." (R. 1, PID 22.)

Michigan's Children's Protective Services arrived at the hospital and spoke with ENN in her room without her parents' consent. (R. 1, PID 22.) According to the Dixons, CPS and police officers (apparently Tillary and Jane Doe) barricaded the room. (R. 1, PID 43.) CPS allegedly "forced minor ENN to answer questions and inspected the child's body." (R. 1, PID 43.) ENN's father wanted to go in the room but Officer Doe allegedly "grabbed Louis Dixon [with] force . . .

because he was knocking on the door and asking CPS to allow him in the room while they were questioning and coerc[ing] his daughter." (R. 1, PID 22.) ENN was allegedly subject to "30 minutes of intimate questioning." (R. 1, PID 44.)

Eventually ENN was transferred to Havenwyck Hospital, a private psychiatric and residential facility. (R. 1, PID 24.)

In early December 2016, two CPS workers went to the Dixons' home. (*See* R. 1, PID 25–26.) D. Holmes with CPS asked the Dixons why ENN had been hospitalized four to five times for mental illness, why the Dixons did not trust the system, and why Louis had hit ENN with a stick. (R. 1, PID 25.) Felicia advised Holmes "that those phony allegations probably came from those 'Bull daggering Police Officers', and that we have been fighting with homosexuals concerning our rights to live in this country as God deemed for man and woman in marriage to do." (R. 1, PID 25.) The other CPS worker, John Doe, stated he was investigating whether there was mental illness in the Dixons' home. (R. 1, PID 26.) Louis stated that he had been diagnosed as a schizophrenic coming out of the military. (*Id.*)

After about a week at Havenwyck, the Dixons requested to speak to ENN's treating doctor, Dr. Mlak. (R. 1, PID 27.) They inquired into why ENN could not be discharged. Dr. Mlak responded that every time he tried to discharge ENN, she stated she was going to come home and hurt herself and others. (*Id.*) According to the Dixons: "We advised him at that time that E.N.N. start facing a lot of problems when Tamir Rice was killed by a white police officer[.] We also advised him that the homosexuals in various positions have attacked our family and left us destitute and this caused E.N.N. to have a lot of psychological problems. [Dr. Mlak] stated that he would not allow any type of discrimination to go on at the facility." (R. 1, PID 27.)

After ENN was at Havenwyck another week, the Dixons spoke with a patient advocate, Roger Elle. They inquired as to why ENN was being fed pork. (R. 1, PID 27.) Tori, a social worker at Havenwyck, stated that Dr. Mlak would meet with the Dixons but that the Dixons' children could not be in the room. (R. 1, PID 28.) That day, Havenwyck informed the Dixons that ENN had an allergic reaction to Abilify, which the Dixons thought was "real strange" given their recent complaint about the care ENN had been receiving. (R. 1, PID 28.) According to the Dixons: "We were through talking to Dr. Mlak, Tori, and Roger because it was obvious they are participating in this conspiracy against a Black Nuclear Heterosexual Family." (R. 1, PID 28.)

The Dixons decided to go to the Michigan Department of Civil Rights to file a complaint against Havenwyck. (R. 1, PID 29.) Several months earlier the Dixons had filed a complaint against St. John Hospital for their failure to circumcise their son. (R. 1, PID 21, 29.) (The Dixons claim that St. John's "had a distaste for a black boys' religious right[s]" and that "what has happened to ENN is a retaliation for standing up for [their] sons' rights." (R. 1, PID 29.)) At the Michigan Department of Civil Rights, the Dixons saw Valerie Barkley in the waiting room. (R. 1, PID 29.) Barkley is the investigator in the St. John's case. (*Id.*) Barkley allegedly told the Dixons that she used to be a CPS worker and that "no ethical caseworker from CPS would fool with" Havenwyck. (*Id.*) Barkley allegedly said that she was surprised that Havenwyck had not been shut down. (*Id.*)

Marquis Dennings at the Michigan Department of Civil Rights took the Dixons' complaint. (R. 1, PID 29–30.) It appears that the Dixons complained that Havenwyck was treating ENN differently because of her race and religion. (R. 1, PID 29.) The Dixons also accused Havenwyck staff of ignoring ENN's dietary restriction and teasing her about being Muslim. (R. 1, PID 29.) Although Dennings "appeared to be sympathetic," he failed to submit

4

the complaint to Havenwyck within one or two days as he said he would. (R. 1, PID 30.) According to the Dixons: "[Dennings] acted like another person when we called him and we knew at this point we had a lot of individuals in positions working against us." (R. 1, PID 30.)

After the Dixons attempted to contact Holmes numerous times, Holmes called the Dixons on December 15, 2016. (R. 1, PID 31.) The Dixons "explained to [Holmes] that [Havenwyck staff] are refusing to discharge E.N.N. because she is actively suicidal/homicidal, and . . . we wanted parents, E.N.N. and Mlak in the same room to get to the bottom of why she is still in this facility." (R. 1, PID 31.) Holmes stated that she would set up a meeting and call the Dixons back in about 30 minutes. (R. 1, PID 31.) When the Dixons asked to talk with someone "less busy," Holmes allegedly became hostile. (*Id.*) The Dixons say that Holmes never called them back. (*Id.*)

On December 27, 2016, the Dixons attended a video hearing before Lawrence J. Paolucci, a probate judge. (R. 1, PID 32.) Louis testified that he wanted ENN to be released for outpatient therapy. (*Id.*) An attorney for the State wanted ENN to stay in the hospital. (*Id.*) It appears that Jeffrey Ehrichman acted as ENN's guardian ad litem. (*Id.*) Dr. Slistack, who had never spoken with the Dixons and only met with ENN twice, opined that ENN was psychotic with depression, hallucinations, and early psychosis. (R. 1, PID 32.) Dr. Slistack advised Judge Paolucci that ENN was afraid of going home because she was afraid of her father. (R. 1, PID 33.) Judge Paolucci denied the Dixons' request for outpatient care and ordered that ENN stay in at Havenwyck for a period of 60 to 90 days. (*Id.*)

The Dixons say that they continued to visit ENN and call her but "it really got ridiculous from the point of the court order." (R. 1, PID 33.) The Dixons allege: "We would call the hospital several times a day trying to communicate with E.N.N. and we would hear the staff in the background coercing E.N.N. into saying things like 'F*** God' and 'F*** Us'. E.N.N.

would also go on about how Dr. Mlak states it is o.k. to be a boy. Now what kind of facility would promote this type of Anti-Christ behavior with and toward a child from a two-parent home born in wedlock." (R. 1, PID 34.)

In June 2017, the Dixons filed suit, naming over 40 defendants (and 100 "doe defendants") and asserting 19 counts. (R. 1, PID 15–16.)

## II.

As the Dixons seek to proceed without prepaying the filing fee, the Court must screen their Complaint. In particular, "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . (B) the action or appeal—(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

## III.

### A.

As an initial matter, the Court will dismiss ENN, JDN, and LNJ, and all claims belonging to those minors, from this lawsuit. This is because the Dixons have not retained counsel and are not themselves attorneys. Thus, Louis and Felicia can only represent themselves, not their children. *See White v. Emergency Medicine Billing & Coding Co.*, No. 11-14207, 2013 WL 4551919, at *2 (E.D. Mich. Aug. 28, 2013) (discussing issue at length).

### B.

Upon a very preliminary review of the case law, and without the benefit of a response from any defendant, the Court declines to dismiss several of the Dixons' claims at this time.

The Court will not now dismiss Count III. There, the Dixons assert that "Defendants" have violated their "right to the free exercise of choice of medical treatment, as guaranteed by the First and Fourteenth Amendments to the United States Constitution." (R. 1, PID 41.) According to the Dixons, DMC or Havenwyck staff "failed to acknowledge that they have prescribed drugs to minor E.N.N. and they have harmed her greatly." (R. 1, PID 41.) The Due Process Clause may provide the Dixons with a limited right to control the medical care ENN receives. *See Thomas v. Kaven*, 765 F.3d 1183, 1194–95 (10th Cir. 2014) ("The Fourteenth Amendment protects the right of parents to make decisions 'concerning the care, custody, and control of their children.' This right provides 'some level of protection for parents' decisions regarding their children's medical care.'" (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010)). It also possible (although the Sixth Circuit has seemed to indicate otherwise) that the Dixons may be able to assert a claim under the Free Exercise Clause and the Fourteenth Amendment. *See Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 243–47 (3d Cir. 2008) (discussing circuit split). And if DMC or Havenwyck was treating ENN not just for medical reasons, but because of its child-protection obligations under state law or the probate court's order, it is possible that those hospitals engaged in state action under § 1983. *Cf. Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000) (finding that private hospital's decision not to allow mother to take her newborn home for medical reasons was not conduct "under color of state law," but hospital's hold on the newborn's release "as part of the reporting and enforcement machinery for [the Child Welfare Administration]" was state action).

The Court also declines to dismiss Count I. There, the Dixons allege, "We . . . believe according to the Old Testament that pork i[s] not to be consumed[.] Leviticus 11:7–8." (R. 1,

7

PID 36.) They also say they told Havenwyck staff that ENN was not to eat pork. (R. 1, PID 27.) Yet, according to the Dixons, "Havenwyck Hospital purposely fed E.N.N. pork which she has never consumed a day in her life with her parents." (R. 1, PID 36.) It is possible that the Dixons have a First Amendment claim against Havenwyck (again assuming Havenwyck held ENN not for medical treatment but for child-protection reasons). *Cf. Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 684 (7th Cir. 1994) (finding parents had standing to challenge school's reading program under the Free Exercise Clause because "[o]ne aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children").

The Court will also not dismiss Count IV at this time. There, the Dixons allege that "Defendants" violated the Fourth Amendment when CPS interviewed ENN and examined her body in her hospital room. (R. 1, PID 42–43.) It appears that the following individuals were involved in the interview: Officer Tillery, Officer Jane Doe, a "male security/police [officer] with [Children's Hospital of Michigan]," and "a male and a female CPS Worker." (*See* R. 1, PID 23–64.) ENN may have a Fourth Amendment claim against these individuals. *See Doe v. Heck*, 327 F.3d 492, 510–15 (7th Cir. 2003) (finding seizure in violation of the Fourth Amendment where Bureau of Child Welfare entered private school without school's or parent's consent and removed child from his classroom to interview child about abuse); *Michael C. v. Gresbach*, 526 F.3d 1008, 1014–16 (7th Cir. 2008) (finding search in violation of the Fourth Amendment where Bureau of Child Welfare entered private school and examined child's back for signs of abuse without parent's consent); *New v. United States*, 652 F.3d 949, 952 (8th Cir. 2011) (citing state-court decisions and noting a "split of authority on the question whether a patient has a reasonable expectation of privacy in a hospital room").

The Court acknowledges that the Dixons may not have standing—in the Fourth Amendment sense—to assert ENN's Fourth Amendment claim both because ENN has been dismissed from this case and because Jeffrey Ehrichman has acted as ENN's guardian ad litem. *Cf. Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012) ("A Fourth Amendment child-seizure claim belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf."); *Hollingsworth v. Hill*, 110 F.3d 733, 738 (10th Cir. 1997) ("Undoubtedly, parents may assert their children's Fourth Amendment rights *on behalf of* their children. Ms. Hollingsworth does not assert her children's Fourth Amendment rights on their behalf because her complaint does not include the children as plaintiffs." (citation omitted)). But the Court is not now certain of the standing issue. In any event, Count IV also asserts that the hospital-room interview violated the Dixon's familial association rights under the Due Process Clause (R. 1, PID 42, 44) and that could be a viable claim even if the Dixon's cannot pursue a claim under the Fourth Amendment. *See Southerland*, 680 F.3d at 142; *Thomas*, 765 F.3d at 1196.

Count VI will be dismissed in part. There, the Dixons say that a number of Defendants "conspired to threaten Plaintiffs['] liberty right to custody of their children," and used fundamentally unfair procedures in removing ENN from them. (R. 1, PID 46–47.) The Dixons bring this claim under the Due Process Clause and the Equal Protection Clause. (R. 1, PID 46–47.)

The Court will dismiss the Dixons' equal-protection claim asserted in Count VI. They identify no parents (or children) similarly situated to themselves (or ENN) that were treated differently. And the Dixons' claims of disparate treatment on account of their race, religion, and sexual-orientation are conclusory and based on speculation.

And to the extent Count VI pertains to Defendants' conduct after the probate-court hearing on December 27, 2016, the Court will dismiss the Dixons' claim under the Due Process Clause. By that point, the Dixons had received a hearing, so any procedural due process owed was given. As far as substantive due process, the allegations in the Complaint, when viewed in light of the probate-court's determination that ENN needed to stay at Havenwyck, do not permit the Court to reasonably infer that the State did not have a "compelling purpose" for keeping ENN at Havenwyck. *See Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728–29 (6th Cir. 2011) ("[S]ubstantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights *unless* the action is necessary and animated by a *compelling purpose*." (emphases added) (internal quotation marks omitted)); *Thomas*, 765 F.3d at 1196 ("Regardless of the intensity of a familial association claim, our cases establish that the right is not absolute, but must be weighed against the state's interest in protecting a child's health and safety in order to determine whether state actors unduly burdened that right in a given case."). Moreover, any infringement on the Dixons' familial-association rights after the hearing was due to the probate-court order. *See Pittman*, 640 F.3d at 729 ("Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive Pittman of his fundamental right."). And if the deprivation was due to the probate court, the Dixons' claim would be barred by judicial immunity. *See Baker v. Smith*, 72 F. App'x 339, 341 (6th Cir. 2003).

But to the extent that Count VI pertains to Defendants' conduct *before* the probate-court hearing on December 27, 2016, the Court will not dismiss the Dixons' claim under the Due Process Clause at this time. The Dixons arguably have substantive and procedural familial-association rights under the Due Process Clause. *See Southerland*, 680 F.3d at 142; *Thomas*, 765

F.3d at 1196. And, as stated, that claim could run against DMC and Havenwyck if they were not holding ENN for medical reasons, but in their role as part of CPS' "reporting and enforcement machinery." *See Kia P.*, 235 F.3d at 756.

## C.

The Court will dismiss the remaining counts of the Dixons' Complaint under § 1915(e)(2)(B).

In Count II, the Dixons allege a breach of their familial-association rights under the Due Process Clause. (R. 1, PID 37–38.) The basis for this claim is that "Defendants" "knowingly present[ed] false allegations, false or coerced testimony, fabricated evidence, and/or suppressed exculpatory evidence, during the CPS Administrative Proceedings." (R. 1, PID 39.) These statements are wholly conclusory and a review of the factual allegations of the Complaint indicates that the Dixons' claims of false testimony or evidence are based on pure conjecture and irrationality. They claim that when CPS workers confronted them with several allegations, that those "allegations probably came from those 'Bull daggering Police Officers,'" apparently referring to Officer Tillary and Officer Jane Doe. The Complaint also says, "these officer were homosexual and obviously bias against their heterosexuality as a Black Family." The Dixons give no reason to think that Tillary and Doe would be prejudiced against a heterosexual, African American family and nothing in their alleged conduct even hints at that. To the extent that the Dixons refer to evidence or testimony introduced at the probate-court hearing, they have not identified anything fabricated. Although the Dixons question Dr. Slistack's familiarity with ENN's mental health, nothing in the Complaint indicates that anything he told the probate judge was fabricated. (*See* R. 1, PID 32.) Count II will be dismissed.

Count V will be dismissed. There, the Dixons say that their rights under the Confrontation Clause of the Sixth Amendment were violated because Holmes did not tell them they were under investigation prior to the probate-court hearing and because Holmes did not attend the hearing to "verify" Dr. Slistack's testimony. (R. 1, PID 45.) But the Court doubts that the Confrontation Clause is implicated by a child-custody hearing, which is not a criminal proceeding. *See Jones v. Buckner*, 963 F. Supp. 2d 1267, 1278 (N.D. Ala. 2013); *but cf. Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27–34 (1981) (holding that indigent plaintiffs facing child custody termination proceedings may be entitled to court-appointed counsel under the Sixth Amendment). The Dixons also had the ability to question Dr. Slistack and they do not identify any testimonial statements by Holmes that were admitted.

In Count VII, the Dixons seek to hold supervisors of certain defendants liable under § 1983. The Dixons' allegations do not provide sufficient facts to infer that a supervisor "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *see also Lynn v. City of Detroit*, 98 F. App'x 381, 385 (6th Cir. 2004) ("[S]upervisory liability will attach if the defendants possessed information revealing a 'strong likelihood' of unconstitutional conduct by subordinate officers but did nothing to prevent the misconduct, thereby causing harm to the plaintiffs."). Count VII will thus be dismissed.

Count VIII will be dismissed. The Dixons title this count as "conspiracy to interfere with rights." (R. 1, PID 50.) But the Complaint does not set forth facts permitting the Court to reasonably infer a conspiracy. *See Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 367–68 (6th Cir. 2012) ("[C]onspiracy claims must be pled with some degree of specificity."). The Dixons also assert in this count that they have suffered "extreme emotional and physical distress"

due to Defendants' "extreme and outrageous conduct." (R. 1, PID 50.) To the extent this is an attempt to plead an intentional infliction of emotional distress claim, the Court declines supplemental jurisdiction.

Count IX asserts that Defendants have violated 42 U.S.C. § 1986. "Section 1986 creates a cause of action for knowing failure to prevent wrongful acts pursuant to a conspiracy to interfere with civil rights, as described in 42 U.S.C. § 1985." *Braley v. City of Pontiac*, 906 F.2d 220, 227 (6th Cir. 1990). In turn, § 1985 requires the Dixons to adequately plead, among other things, a conspiracy. *Webb v. United States*, 789 F.3d 647, 671–72 (6th Cir. 2015). The Court has already found that the Dixons have failed to do so. So the Dixons' claim under § 1986 will be dismissed. *See Braley*, 906 F.2d at 227.

In Count X, the Dixons assert "hospital terrorism." (R. 1, PID 51.) This claim is frivolous and will be dismissed.

In Count XI, the Dixons assert that Defendants have deprived them of substantive due process. (R. 1, PID 52.) But the count adds nothing new over other counts. So this count will be dismissed as duplicative.

In Count XII, the Dixons assert "trespass under color of law for acts caused in coram non judice." (R. 1, PID 53.) The Latin means "not before a judge." This count otherwise adds nothing new over other counts. The Court has already found that the Dixons' claims under the Due Process Clause insofar as it based on events before the probate-court hearing will not be dismissed. Accordingly, the Court will dismiss Count XII as duplicative.

In Count XIII, the Dixons assert "unjust enrichment." The Compliant does not plead how any defendant was unjustly enriched. This Count will be dismissed.

In Count XIV, the Dixons assert that "Social Worker Defendants and Medical Worker Defendants, Detroit Police Dept., & CPS intruded upon the privacy of the Dixons' family by, but not limited to, threatening to remove their children from the parents without judicial authorization, without parental consent, and in the absence of exigent circumstances; failing to discharge their duty to consider and illegally seizing E.N.N. for prolonged interrogation without authorization of parents." (R. 1, PID 54.) The Court fails to see how this states anything beyond that alleged in Counts IV and VI as this Court has construed those two counts. So Count XIV will be dismissed as duplicative.

Count XV appears to be the same as Count XIV, so the Court will also dismiss Count XV. (*See* R. 1, PID 55.)

Count XVI, titled "declaratory relief," apparently asks the Court to declare numerous alleged policies or practices unlawful. (*See* R. 1, PID 57.) The Dixons, who have only described their family's interactions with Defendants, have not adequately pled any unlawful policy or practice. This count will be dismissed.

In Count XVII, the Dixons ask the Court to award them preliminary injunctive relief. (R. 1, PID 58–59.) But relief is not a cause of action. So this count will be dismissed.

Count XVIII asserts that no defendant has "discretion to perform inconsistent acts." This does not state a claim.

Count XIX is the same as Count XVIII. It too will be dismissed.

Finally, to the extent that the Dixons claim that St. John's violated the Constitution by not circumcising LNJ, the Dixons have not adequately pled that St. John's engaged in conduct "under the color of state law" as § 1983 requires.

# IV.

For the reasons provided, the remaining claims in this case are as follows:

(1) Havenwyck Hospital and Havenwyck staff have violated the Dixons' rights under the Free Exercise Clause by feeding ENN pork, with knowledge of the Dixons' religious beliefs;

(2) Detroit Medical Center and Havenwyck, and their staffs, have violated the Dixons' rights under the Due Process Clause by providing ENN certain medical treatment without the Dixons' consent;

(3) Detroit Medical Center and Havenwyck, and their staffs, have violated the Dixons' rights under the Free Exercise Clause by providing ENN certain medications without the Dixons' consent;

(4) CPS agent John Doe, CPS agent Jane Doe, Detroit Police Officer Tillary, Detroit Police Officer Jane Doe, and Detroit Medical Center Security Guard John Doe have violated ENN's Fourth Amendment rights by interviewing ENN and examining her body without the Dixons' consent;

(5) CPS agent John Doe, CPS agent Jane Doe, Detroit Police Officer Tillary, Detroit Police Officer Jane Doe, and Detroit Medical Center Security Guard John Doe have violated the Dixons' rights under the Due Process Clause by interviewing ENN and examining her body without the Dixons' consent;

(6) CPS, CPS staff, DMC, DMC staff, Havenwyck, and Havenwyck staff have violated the Dixons' rights under the Due Process Clause by holding ENN at DMC or Havenwyck before the probate-court hearing on December 27, 2016.

By maintaining these claims in this suit, the Court does not preclude Defendants from moving to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court merely finds that after a very preliminary review, these claims are worthy of more exploration.

All other claims in the Complaint are DISMISSED WITHOUT PREJUDICE.

For each of the six claims above, the Dixons are to file a supplement to their Complaint that identifies the individuals involved in that claim and provides their addresses for service. For example, with regard to claim (1) above, the Dixons are to provide the Court with the service address of Havenwyck Hospital and the names and service addresses of the Havenwyck staff that were allegedly involved in feeding ENN pork. The Dixons must file their supplement to their Complaint on or before August 31, 2017.

SO ORDERED.

Dated: August 11, 2017

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 11, 2017.

s/Keisha Jackson
Case Manager